ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

EVAN MATEER (CABN 326848)
EMILY R. DAHLKE (CABN 322196)
Assistant United States Attorneys

   1301 Clay Street, Suite 340S
   Oakland, California 94612
   Telephone: (510) 637-3680
   FAX: (510) 637-3724
   Evan.mateer@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> BRUCE EDWARD ANDERSON IV, <br><br> Defendant. | CASE NO. 4:22-CR-84-JST <br><br> GOVERNMENT'S SENTENCING MEMORANDUM <br><br> Court: Judge Jon S. Tigar <br> Date: December 1, 2023 <br> Time: 9:30 a.m. |

## I. INTRODUCTION

On December 4, 2020, Defendant Bruce Anderson was in possession of at least two firearms—a black Privately Manufactured Firearm hidden in his car, and a 9mm handgun that he carried on his person. Both firearms were loaded with live ammunition. Mr. Anderson is a felon, and so was not permitted to possess these firearms or the ammunition they were loaded with. But he did not merely possess firearms and ammunition. After Mr. Anderson was assaulted, and while his assailants fled, he drew his firearm and fired at least three rounds through a parking lot crowded with holiday shoppers. To reflect the seriousness of this dangerous conduct and protect the community from Mr. Anderson's violent and reckless decisions, the government asks the Court to impose a sentence of 51 months in prison.

## II. OFFENSE CONDUCT AND BACKGROUND

On December 4, 2020, Mr. Anderson was at a mall in Hayward, California while in possession of two loaded firearms. That afternoon, Mr. Anderson exited the mall and returned to his vehicle, where he say briefly. PSR ¶11-12. While Mr. Anderson was sitting in his car, he was seen by a witness who reported that Mr. Anderson had a black, Glock style firearm sitting in his lap. PSR ¶12. Around the same time that Mr. Anderson entered his vehicle, two males exited a nearby white sedan and ran towards Mr. Anderson. PSR ¶13. Mr. Anderson and the two assailants struggled; eventually the assailants overcame Mr. Anderson and appear to have stolen unidentified items from him. *Id.* As the two assailants ran back to their car, Mr. Anderson got up and walked towards them. *Id.* He paused momentarily and drew a firearm. Mr. Anderson then raised the firearm and fired at least three shots at the assailants' car as they fled. PSR ¶14; Declaration of Evan M. Mateer in Support of Government's Sentencing Memorandum ("Mateer Decl.") Exhibit A. As Mr. Anderson fired, bystanders began running for cover. *Id.* Mr. Anderson then left the area in his vehicle. However, at some point during the altercation, Mr. Anderson had received a gunshot wound to the arm. He returned to the parking lot and was eventually located by police sitting on the ground behind his vehicle.

Officers responded to the scene where they recovered the three spent shell casings ejected from the firearm Mr. Anderson used to fire at the retreating assailants. PSR ¶14. Officers also towed and searched Mr. Anderson's vehicle. PSR ¶16. Underneath the hood of the vehicle, officers found a

removable plastic cover, in which was a 9mm PMF handgun concealed in a cloth bag. *Id.* The firearm was loaded with 6 rounds of live 9mm ammunition. *Id.* The firearm was tested for DNA and the results provided strong support for the presence of Mr. Anderson's DNA on the firearm. PSR ¶18.

In the parties' plea agreement, Mr. Anderson admits that he is a felon and that the ammunition he possessed traveled in interstate commerce.

On January 12, 2021, Mr. Anderson was charged by complaint with one count of violating 18 U.S.C. § 922(g)(1). On March 3, 2022, Mr. Anderson waived indictment and was charged by Information with the same offense. On May 24, 2023, the grand jury returned a Superseding Indictment for the same charge, adding allegations related to the three shell casings recovered from the scene of the shooting. On July 20, 2023, pursuant to a plea agreement between the parties, Mr. Anderson plead guilty to the sole count in the Superseding Indictment.

## III.   THE SENTENCING GUIDELINES CALCULATION

The PSR calculates the offense level as follows (PSR ¶¶ 25-34):

a. Base Offense Level, U.S.S.G. § 2K2.1(a)(6) :                                14
b. Specific Offense Characteristic, U.S.S.G. § 2K2.1(v)(6)(B)                  +4
c. Acceptance of Responsibility, U.S.S.G. § 3E1.1(a) and (b):                  -3
d. Total Offense Level:                                                         15

The government agrees with the PSR's calculation of the offense level. The government also agrees with the PSR's calculation of the defendant's criminal history. PSR ¶¶ 37-47.

Based on his convictions, the defendant's total criminal history score is 13, yielding a Criminal History Category (CHC) of VI. PSR ¶ 48. The applicable sentencing guidelines range for Offense Level 15 and CHC VI is 41-51 months.

### A.   Base Offense Level

Because Mr. Anderson was convicted of 922(g)(1), the applicable guidelines section is U.S.S.G. § 2K2.1. Since Mr. Anderson was a prohibited person at the time of the offense, the base offense level if 14 pursuant to §2K2.1(a)(6). The parties agreed in the plea agreement that the base offense level was 14.

B. **Specific Offense Characteristics**

The government agrees with Probation's recommendation that a four-level enhancement be applied pursuant to U.S.S.G. § 2K2.1(b)(6)(B). This section provides for a four-level enhancement if the defendant "used or possessed any firearm or ammunition in connection with another felony offense." The guidelines define "another felony offense" as "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." *See* Application Note 14(C) to U.S.S.G. § 2K2.1. Where, as here, the firearm used in the other felony offense was cited in the offense of conviction, §(b)(6)(B) applies as long as the "other felony offense" was "part of the same course of conduct or common scheme or plan" as the unlawful possession." *See* Application Note 14(E)(i) to U.S.S.G. § 2K2.1.

Mr. Anderson possessed his firearm in connection with at least three different felony offenses.

*First*, CPC 245(b) makes it felony to commit "assault upon the person of another with a semiautomatic firearm." In the Plea Agreement, Mr. Anderson admits that he "raised a black Glock-style handgun and fired three times at the individuals" who had previously attacked him as they were "fleeing the parking lot." *See* Dkt. 59 ¶2. Under California law, "assault" is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." CPC 240. Mr. Anderson attempted to commit a violent injury on these individuals when he shot at them. Moreover, because they were fleeing when he fired his weapon, he has no claim to self-defense. *See People v. Delrosario*, 2005 WL 45045, at *4 (Cal. Ct. App. Jan. 11, 2005) ("[T]he right of self-defense does not extend beyond the time of real or apparent danger; once [an attacker flees], the right of self-defense [does] not excuse [a] defendant's conduct"). His attempt to cause injury was thus "unlawful."[1]

---

[1] Though Mr. Anderson received a gunshot wound at some point during the altercation, there is no evidence that he was fired on by his assailants, that any of his assailants had, much less fired, a gun, or that the shot that struck Mr. Anderson took place at or near the same time he fired on the fleeing assailants. Indeed, the *only* shell casings found at the scene match the firearm that Mr. Anderson admits he fired, and the only firearm seen on the video is Mr. Anderson's. Moreover, the only blood found at the scene was in the center of the parking lot—close to where Mr. Anderson was attacked—rather than between the rows of car where he fired at his fleeing attackers. Based on the evidence at hand, it is more likely than not that Mr. Anderson shot himself. Absent additional evidence, and in the face of Mr. Anderson's admission that he fired while his assailants were "fleeing the parking lot," there is no basis to conclude that Mr. Anderson was exercising a right to self-defense.

GOVERNMENT SENTENCING MEMO
4:22-CR-84-JST                                3

Finally, the evidence establishes that Mr. Anderson used a semi-automatic weapon. He admitted that the weapon was "Glock-style" and that the casings ammunition fired was 9mm. All "Glock-style" 9mm weapons are semi-automatic.

*Second*, even if the evidence did not establish that the weapon Mr. Anderson fired was semi-automatic, he would be liable under CPC 245(a)(2), which makes it a felony to commit "assault upon the person of another with a firearm," without regard to whether it is semi-automatic.

*Third*, Mr. Anderson's conduct satisfies CPC 246, which makes it a felony to "maliciously and willfully discharge a firearm at an . . . occupied motor vehicle." "Maliciously and willfully" in CPC 246 mean only the intent to take "the proscribed act of shooting at an occupied building or other proscribed target." *People v. Overman*, 126 Cal. App. 4th 1344, 1357(2005). "The statute only requires a shooting under facts or circumstances that indicate a conscious disregard for the probability" that an occupied vehicle may be struck. *Id.* As described above, Mr. Anderson admits that he fired at the three individuals who were fleeing. And video evidence shows that, at the time he fired at them, they were fleeing in a vehicle. Though it is unknown whether any of the shots Mr. Anderson fired at the vehicle struck it, he is at least guilty of attempt to violate CPC 246 under CPC 664. Under California law, a defendant guilty of attempt is liable for one half the prison term of the underlying statute. Because CPC 246 is punishable by "three, five, or seven years" in prison, attempt (punishable by 1.5, 2.5, or 3.5 years in prison), remains a felony for purposes of the (b)(6)(B) enhancement. *See* Application Note 14(C) to U.S.S.G. § 2K2.1.

Finally, Mr. Anderson possessed his firearm "in connection with" each of these offenses. The Ninth Circuit has repeatedly held that when an illegally possessed firearm is used to commit an assault, 2K2.1(b)(6)(B) applies. *See, e.g.*, *United States v. Bare*, 806 F.3d 1011, 1017 (9th Cir. 2015) (applying 2K2.1(b)(6)(B) where a defendant violated an Arizona assault statute by firing an illegally possessed firearm at a victim during an altercation); *United States v. Turnipseed*, 159 F.3d 383, 386 (9th Cir. 1998) (applying 2K2.1(b)(6)(B) when a defendant violated a Washington assault statute by firing an illegally possessed firearm at a "several youths").

### C. Acceptance of Responsibility

Mr. Anderson plead guilty to this offense before the government substantially began preparing

for trial. He is therefore eligible for a 3-point decrease in his total offense level pursuant to U.S.S.G. § 3E1.1(a) and (b).

## IV.    SENTENCING RECOMMENDATION

### A.  Legal Standard

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991 (citation omitted). In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B.  The Government's Recommended Sentence of 51 Months is Sufficient but Not Greater than Necessary

The seriousness of the offense, the history and characteristics of the defendant, and the need for specific and general deterrence all support a 51-month sentence, which is the upper end of his sentencing guidelines range.

Mr. Anderson's conduct here is serious and violent. Though he plead guilty only to possession of ammunition, as he admits in the plea agreement, he in fact did much more than that. The ammunition was loaded into two weapons, one of which he used to fire at fleeing assailants. Worse, he did this in in the middle of the day, in a mall parking lot busy with innocent people shopping during the holiday season. Indeed, the risk to bystanders was not hypothetical: as seen in the image below, rounds Mr. Anderson fired struck vehicles in the parking lot that had nothing to do with the fleeing assailants.



Mr. Anderson's offense thus included both the express intent to try to harm or even kill men who were fleeing from him, as well as reckless disregard for the safety of innocent people all around him. This combination of violence and recklessness is extremely serious and justifies a sentence at the high end of the sentencing guidelines range.

Mr. Anderson's possession of a loaded ghost gun further exacerbates the seriousness of this offense. Ghost guns are often preferred by criminals because of the difficulty in tracking them and have been at the center of the wave of gun violence plaguing the Bay Aera. *See* Ken Miguel, "Bay Area police chief says rise in assault rifles, ghost guns used to 'hunt and kill' people," ABC 7 NEWS, July 2, 2021;[2] Michael Barba, "Ghost guns linked to rise in SF shootings as numbers jump," SAN FRANCISCO CHRONICAL, April 22, 2021.[3] Indeed, the sentencing guidelines reflect an understanding of the added dangerousness of untraceable firearms, providing for a four-level increase where a defendant obliterated a serial number or possesses a firearm that they know or should know had no serial number. *See* U.S.S.G. §2k2.1(b)(4)(B). Although the government has not taken the position that this section applies in this case, the same logic underlying the enhancement—that such weapons are by their nature more dangerous—applies to Mr. Anderson's conduct. A sentence at the high end of the guidelines

---

[2] Available at https://abc7news.com/gun-violence-statistics-san-francisco-bay-area-assault-rifles-murder/10850493/

[3] Available at https://www.sfexaminer.com/news/ghost-guns-linked-to-rise-in-sf-shootings-as-numbers-jump/.

GOVERNMENT SENTENCING MEMO
4:22-CR-84-JST                                      6

accordingly reflects the additional dangerousness associated with untraceable ghost guns, such as those possessed by Mr. Anderson.

Mr. Anderson's history and characteristics also justify the government's recommended sentence. This was not an isolated event. As noted in the PSR, Mr. Anderson has numerous prior felony convictions, which have placed him in the highest criminal history category. PSR ¶¶ 28-29. Mr. Anderson's criminal history is not only extensive in terms of the number and seriousness of convictions, but also in that it extends through his entire adult life, right up until the beginning of his present detention. Indeed, separate from this instant offense, Mr. Anderson currently faces extremely serious charges in state court relating to human trafficking, narcotics distribution, fraud, and firearms possession. *See* PSR ¶¶ 54-55. This extensive history of criminal conduct justifies a substantial sentence.

Mr. Anderson's criminal conduct also demonstrates the need for a substantial sentence to protect the public. Despite prior lengthy prison sentences, including a term of more than 3 years when he was 21 and another 3-year term when he was 35, Mr. Anderson is still consistently involved in serious criminal activity. He has also performed very poorly on supervision: he has had his probation revoked and been and remanded to custody on many occasions. *See* PSR ¶¶ 39, 42. A 51-month sentence will remove Mr. Anderson from the public—interrupting his constant stream of criminal conduct—as well as serve to deter him from continuing his career of crime when he is eventually released.

## V. CONCLUSION

For the foregoing reasons, the United States recommends that the Court sentence the defendant to 51 months' imprisonment, 3 years' supervised release, a $100 special assessment, and forfeiture.

DATED:  November 24, 2023

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

*/s/ Evan M. Mateer*
EVAN M. MATEER
Assistant United States Attorney